IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| AUDREY M. RENNER,<br><br>Plaintiff,<br><br>vs.<br><br>TAKEDA PHARMACEUTICALS U.S.A. INC.,<br><br>Defendant. | CV 15–171–M–DLC<br><br>ORDER |

Plaintiff Audrey Renner ("Renner") moves for sanctions against Defendant Takeda Pharmaceuticals U.S.A. Inc. ("Takeda") alleging spoliation of evidence. Takeda opposes the motion. For the reasons explained below, the Court grants in part and denies in part Renner's motion.

## BACKGROUND

Renner worked as a pharmaceutical sales representative for Takeda and its predecessor companies from April 2006 until May 2015. On May 15, 2015, Renner received a phone call from Takeda investigator Patrick Quillinan ("Quillinan") and Takeda regional human resources manager Susan Glave ("Glave"). During this telephonic interview, Renner was confronted about several alleged inconsistencies in her work records regarding sales calls made to health care providers and other entries in her records. Quillinan asked Renner a series of

questions about these inconsistencies and Renner responded. Quillinan and Glaves took notes. Later that day, Takeda terminated Renner's employment. In a subsequent termination letter, Takeda stated Renner was discharged because she allegedly "failed to maintain accurate Company records" (Doc. 16-1 at 1.) Specifically, Takeda alleged that Renner had incorrectly entered the time and dates she met with the healthcare professionals in an attempt "to misrepresent [her] work activities on certain days." (*Id.* at 2.) The letter then listed multiple perceived discrepancies in Renner's work history, including four office calls she made in March and April of 2015. The letter listed the names of four health care providers who were allegedly contacted by Quillinan. These health care providers allegedly told Quillinan that they were not in the office on the dates Renner said she had made the office calls and thus they could not have met with her. Upon determining that Renner's alleged misrepresentations violated Takeda employee policies, she was terminated.

Renner alleges that her termination was pretextual and states that she was actually fired because she refused to engage in "off-label marketing."[1] Renner argues that Takeda's basis for discharging her, i.e., misrepresenting the dates she

---

[1] Renner states that "off-label marketing" is an "illegal sales tactic" where "drug manufacturers . . . promote uses not specified on the product label" in order "to evade the regulatory process, either because they wish to avoid the costs of conducting clinical trials, or because their data would not meet FDA standards." (Doc. 16 at 10–11 (citing Hutt, Merrill, and Grossman, *Food and Drug Law*, p. 925 (Foundation 4th ed. 2014)).)

met with health care professionals, was manufactured by Takeda in order to terminate her. As evidence that her discharge was pretextual, Renner states that she has contacted the four medical professionals that were allegedly out of the office when Renner visited and three of the four stated that they were at the office on the days in question.[2] The fourth medical provider stated that she was no longer in possession of her records and could not confirm whether she was in the office. However, all four provided signed affidavits averring that they never spoke with Quillinan or any other representative from Takeda.

Quillinan, during his deposition, stated that he did not actually speak with the health care providers named in Renner's termination letter and, instead, spoke with their office managers or receptionists to confirm that the providers were out of the office. However, he could not remember the names of the people he spoke with or the specific dates he called. Quillinan further stated that it is good practice to record these types of details when conducting an investigation, but did not do so on this occasion. Quillinan did, however, take handwritten notes during these phone calls but destroyed these notes, as well as notes taken during Renner's May 15, 2015 interview, after he submitted his official report of the investigation to Takeda. Nevertheless, Quillinan steadfastly maintains that nothing in the notes

---

[2] The three health care providers, however, could not recall if Renner visited their offices on the days in question.

were omitted from the final report. Quillinan said he completed his report on or about June 4, 2015, and destroyed the notes sometime between then and June 10, 2015, the day he was instructed by Takeda's legal department to retain all documents relevant to Renner's termination.

Renner now argues in the underlying motion that Quillinan consciously and willfully destroyed his notes in an attempt to spoliate relevant evidence. In particular, Renner asserts that she has been materially prejudiced by the destruction of the notes because can no longer determine if there are inconsistencies or errors between the notes and Quillinan's official report of the investigation. Renner also argues that she was prejudiced by the destruction of the notes taken during her May 15, 2015 interview because, like the previously discussed notes, she can no longer determine if there are inconsistencies between her memory of the interview and the version Quillinan reported to Takeda. Because these notes can no longer be reproduced, Renner moves for dispositive sanctions in the form of default judgment.

## DISCUSSION

Under its inherent power to control litigation, a district court may impose sanctions for the spoliation of evidence. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) *(citing Anheuser–Busch, Inc. v. Natural Beverage*

*Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)). However, sanctions may only be imposed if "a party knew, or reasonably should have known, that the spoliated evidence was potentially relevant to a claim." *Peschel v. City Of Missoula*, 664 F. Supp. 2d 1137, 1141 (D. Mont. 2009) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993)). Generally, three types of sanctions exist for the spoliation of evidence: (1) dismissal of the claim of the party who is responsible for the spoliation; (2) the exclusion of evidence or witness testimony corresponding to the evidence destroyed; or (3) an adverse jury instruction. *Kopitar v. Nationwide Mut. Ins. Co.*, 266 F.R.D. 493, 499–500 (E.D. Cal. 2010) (citing various opinions by the Ninth Circuit, Seventh Circuit, and United States Supreme Court).

Importantly, dismissal or the entry of default, the most drastic sanction, requires a court to find "willfulness, fault, or bad faith" on the part of the party who destroyed the evidence. *Leon*, 464 F.3d at 958 (citing *Anheuser–Busch*, 69 F.3d at 348). Further, dismissal may also be appropriate if the destruction of the evidence "relates to the matters in controversy in such a way as to interfere with the rightful decision of the case." *United States v. Natl. Med. Enterprises*, Inc., 792 F.2d 906, 912 (9th Cir. 1986) (citations omitted).

### A. Willfulness, Fault, or Bad Faith

As discussed, the Court may only consider dismissal as an option if it finds

that Quillinan destroyed his notes willfully or in bad faith, and if he knew or should have known that they were relevant to this case. There does not appear to be a dispute that Quillinan intentionally destroyed his notes sometime between June 4, 2015, the day he submitted his final report, and June 10, 2015, the day he was notified of the legal hold on Renner's employment file. Instead, Takeda is apparently taking the position that Quillinan lacked express notice of the litigation and merely followed ordinary company practices when he destroyed the notes.

Renner disputes Quillinan's argument that he lacked notice of the legal hold and points to a May 29, 2015 letter that she, through counsel, sent to Takeda. This letter requested that all records and documents related to Renner's employment be maintained due to the potential for litigation. The letter also expressly stated that: "[a]ny deletion, alteration, or other modification or destruction of evidence pertaining to her employment will be treated as spoliation of evidence." (Doc. 16-6 at 1.)

Takeda acknowledges receipt of this letter but argues that in a corporation as large as Takeda, it takes several days for word of potential litigation to trickle down to the appropriate persons. However, this argument is undermined by a June 2, 2015 email sent by Glave, Takeda's human resources official, to Quillinan. In this email, Glave notifies Quillinan that Renner has retained counsel and is

requesting her employment file. (Doc. 16-9 at 1.) Additionally, the next day, Sonali Das, Takeda's attorney, sent an email to Glave and Quillinan where she discussed how Montana law allows a disciplined employee to receive all records related to the discipline. She then specifically asked Quillinan to "pull" Renner's "security file" so she could provide it to Renner. (Doc. 28-2 at 2.) Quillinan responded the same day that he received the email. (*Id.*)

Based upon these emails, the Court determines that Quillinan was aware as early as June 2, 2015, that Renner had retained an attorney as a result of her termination. Further, on June 3, 2015, Quillinan was instructed by Takeda's attorney to retain and produce all files related to the investigation and subsequent termination. Accordingly, the Court finds that by this date, Quillinan should have known that Takeda could be involved with litigation related to Renner's termination. Further, also by this date, he should have known that all documents involved with Renner's termination, including his notes from his investigation and the May 15, 2015 interview, were potentially relevant to any upcoming litigation. Thus, the Court determines that Quillinan willfully destroyed these notes with the knowledge that they could be relevant to upcoming litigation. Having determined that Quillinan's actions were willful, the Court must now determine if Renner was prejudiced by the destruction of the notes.

**B. Prejudice**

As mentioned above, Renner asserts that she has been prejudiced in two separate ways. First, Renner states that she is prejudiced by the destruction of the notes Quillinan took during the May 15, 2015 interview because she can no longer determine the precise questions she was asked and her exact answers. As a result, Renner can no longer determine if there was any exaggerations or inconsistencies as to what she told Quillinan and what he wrote in his report.

Second, Renner also argues that she was prejudiced by the destruction of the notes Quillinan took during his investigation concerning the four health care providers. Similar to her arguments above, Renner contends that the absence of the notes precludes her from determining if Quillinan misrepresented the information in his final report, or if he left out key details in the final report that were included in the notes, such as the dates he called the health care providers and the names of the persons he spoke with. Importantly, Renner now argues that it is her belief that Quillinan never actually called the health care providers in question and, instead, manufactured the basis for her termination as pretext. Accordingly, because her Complaint seeks exemplary damages in addition to actual damages, lack of the notes, Renner asserts, will hinder her ability to challenge Takeda's argument that there was good cause for the termination, as

well as prevent her from proving actual malice or actual fraud. *See* Mont. Code Ann. § 27–1–221 (allowing the award of "reasonable punitive damages . . . when the defendant has been found guilty of actual fraud or actual malice").

The Court first finds that Renner is prejudiced by the destruction of the notes from the May 15, 2015 interview, however not to the extent maintained by Renner. Renner was present during this interview and can presumably rely upon her memory to challenge Quillinan's and Glave's versions of what occurred. Further, Glave's notes from the interview have been retained and can be used by Renner when cross-examining Quillinan or Glave at trial. However, because Quillinan's notes would provide a fuller picture of what occurred during the May 15, 2015 interview, lack of these notes does minimally prejudice Renner.

In contrast, the Court finds that destruction of Quillinan's notes pertaining to his investigation, and in particular the notes from his alleged phone calls to the four health care providers, significantly prejudices Renner. The primary issue in this case is whether Renner was terminated for good cause. The main support for a finding of good cause is Renner's alleged misrepresentations of the dates she visited the four health care providers. Quillinan claims that he called representatives of the four health providers and they confirmed that Renner did not visit the health care providers on the days in question. However, this claim has

been severely undermined by the health care providers themselves, who now aver that they were in their offices on the dates in question and could have met with Renner. Further, all four providers swear they have never spoke with Quillinan, or any other representative from Takeda. Quillinan's notes from his investigation may have contained additional details about who he called and when he called. These details are central to this case. Because destruction of the notes hinders Renner's ability to either substantiate or undermine Quillinan's version of his investigation, Renner has been prejudiced. Thus, the only question that remains is the appropriate sanction.

**C. Appropriate Sanction**

In determining that appropriate sanction, the Court should consider various factors, including: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Anheuser-Busch*, 69 F.3d at 348 (citations omitted). However, a "district court need not make explicit findings regarding each of these factors." *Leon*, 464 F.3d at 958; *see also Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990) ("The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts

against a . . . dismissal sanction. Thus the key factors are prejudice and the availability of lesser sanctions."). After review of these factors, the Court will focus its analysis on the prejudiced incurred by Renner as a result of the spoliation and the availability of lesser sanctions.

*i. Level of Prejudice*

As discussed, Renner asserts that destruction of the notes has prejudiced her beyond repair. Renner argues that default judgment is the only appropriate sanction for Quillinan's actions. Takeda vehemently protests an order granting default judgment and argues that Renner is overstating the importance of Quillinan's notes. In support, Takeda highlights the fact that Quillinan has testified that he did not record any names or dates in his notes, and his final report incorporated all the details contained in the notes.

Despite both parties arguments, the Court finds that there is simply no way to measure the prejudice incurred by Renner as a result of the destruction of the notes. Without the actual notes, the Court is unable to determine: (1) if important details were left out of the final report; (2) if Quillinan manufactured his calls to the health care providers; or (3) if he was telling the truth and all the details in the notes were incorporated into the final report. However, the Court is able to determine that the destruction of the notes, though it may hinder Renner's ability

to pursue her case, will not make the rightful decision of this case impossible.

As discussed, due to the testimony of the four health care providers, Renner may still undercut Quillinan's credibility at trial, and his version of the events in question, without the notes. Renner's theory that Takeda, through Quillinan, manufactured the basis for her termination as pretext for the real reason she was fired, i.e., her refusal to engage in off-label marketing, is still an available theory to pursue. If anything, Quillinan's destruction of his notes provides further support for this theory.[3] Accordingly, though Renner has been prejudiced by the destruction of the notes, the prejudice is not so severe as to warrant the ultimate sanction of dismissal. *See Natl. Med. Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir. 1986) ("The sanction of dismissal should be imposed only in extreme circumstances . . . ."). This decision is guided by the availability of lesser sanctions.

### ii. Availability of Lesser Sanctions

When determining the appropriate sanction for spoliation of evidence, the Court should impose the "least onerous effective sanction." *In re Napster, Inc. Copy. Litig.*, 462 F. Supp. 2d 1060, 1074 (N.D. Cal. 2006). This is reflective of

---

[3] Similarly, the Court finds that the destruction of the notes cuts both ways in regards to Renner's request for exemplary damages. The Court agrees with Renner that these notes could have presented evidence in support of actual malice or actual fraud on the part of Quillinan or Takeda. However, the notes could have also confirmed Quillinan's version of events and undermined Renner's request for exemplary damages.

the Court's duty to exercise its inherent powers with restraint and discretion. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) (citations omitted). As discussed, a default sanction is the most drastic sanction and should only be employed in the most extreme circumstance, namely when lesser sanctions would not be effective. *In re Napster*, 462 F. Supp. 2d at 1074.

At the hearing on the underlying motion, the parties offered multiple lesser sanctions as an alternative to dismissal. These sanctions include: (1) preventing Quillinan from testifying at trial; (2) the exclusion of any evidence related to Quillinan's investigation, including testimony related to what the four health care providers or their staff allegedly told him; and/or (3) an adverse inference jury instruction.

Here, the Court's decision is guided by *Reed v. Honeywell International Inc.*, 2009 WL 886844 (D. Ariz. Mar. 31, 2009). There, plaintiff brought suit alleging she had been unlawfully discharged. *Id.* at *5. Defendants, her former employer and supervisors, alleged that she had been terminated for cause after she had discussed an investigation concerning the abuse of the company rewards policy with another employee. *Id.* at *4. Her employer alleged that she was expressly told during a meeting with a human resources official that the investigation was confidential and she was not suppose to discuss it with any other

employees. Plaintiff disputed Defendants' version of the meeting with the human resources official and argued that she was never told not to discuss the investigation. After discovering that the human resources official's notes from the meeting with plaintiff were spoliated, plaintiff argued that all evidence related to the investigation, including the human resources official's conversations with plaintiff and her co-workers, should be excluded. *Id.* at *10. The district court sympathized with the employee and noted that:

> [w]ithout access to the notes, Plaintiffs[4] are unable to cross-examine [the human resources official] regarding any discrepancies between the handwritten notes and his typewritten summaries. The notes could have revealed inconsistencies in his testimony about what the witnesses told him and might have revealed any exaggerations or mistakes in memory. They also would have revealed any inconsistencies between what the witnesses told him and what they told the ultimate decisionmakers. Plaintiffs are unable to obtain this information from any other source. Plaintiffs thus appear to have established that they are prejudiced by [the employer's] inadvertent loss of [the human resources official]'s notes.

*Id.* at *11. However, after recognizing that the former employee had been prejudiced by the loss of the notes, the district court found that the exclusion of all evidence related to the human resources official's investigation would be akin to a directed verdict and thus too harsh of a penalty. Instead, the district court allowed

---

[4] The Court notes that the *Honeywell International* court repeatedly referred to the singular employee as "Plaintiffs." This Court clarifies that the *Honeywell International* court was most likely referring to the employee and her attorney.

-14-

the discharged employee to submit a request for an adverse jury instruction at trial.

Like the district court in *Honeywell International*, this Court finds that the appropriate remedy for the spoliation of Quillinan's notes is an adverse inference jury instruction. Though the Court has found that Quillinan's actions were willful, a default sanction, or the exclusion of evidence that would amount of to default sanction, is too harsh of a penalty for the conduct in question. The Court comes to this finding by comparing Quillinan's actions and the resulting prejudice to Renner, against other decisions in this circuit where a dismissal sanction was found to be appropriate due to the extreme conduct by the offending party. *E.g., Leon*, 464 at 959 (district court dismissed claim because plaintiff willfully spoliated evidence after intentionally deleting 2,200 computer files and creating a computer program to write over the deleted files); *see also Valley Engineers Inc. v. Electric Engr. Co.*, 158 F.3d 1051, 1059 (9th Cir. 1998) (district court's dismissal of claim was an appropriate sanction after party violated multiple court orders regarding discovery, misrepresented the nature of the discovery to the court, and hid a key document from the parties and the court).

Consequently, the Court will deny with prejudice Renner's motion to the extent it seeks sanctions in the form of default judgment. However, the Court will deny without prejudice Renner's motion concerning the exclusion of certain

evidence related to the spoliation of the notes and will reserve ruling on this issue until trial. Nevertheless, the Court will grant Renner's motion in so far as it requests a sanction through the use of an adverse inference jury instruction. The Court will allow Renner to submit a proposed adverse inference jury instruction at trial, which the Court will strongly consider giving. However, the Court reserves the right to draft its own adverse inference instruction. In any event, an adverse inference instruction will be given at trial.

Accordingly, IT IS ORDERED that Renner's Motion for Sanctions (Doc. 15) is GRANTED IN PART and DENIED IN PART in accordance with the above Order.

Dated this 12th day of January, 2017.

/s/ Dana L. Christensen
Dana L. Christensen, Chief District Judge
United States District Court